UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Rebecca Rojas, o/b/o J.C.P., a minor, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 CV 50017 |
| ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Rebecca Rojas ("plaintiff"), on behalf of her minor son J.C.P. ("JP"), brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits to JP. For the reasons explained below, the decision is affirmed.

### BACKGROUND

On May 20, 2011, plaintiff filed an application on JP's behalf for supplemental security income.[1] JP was then 8 years old. He lived with his mother and four sisters. The following facts are mostly taken from plaintiff's opening brief, with some details added for context.

In January 2011, several months before his disability application was filed, JP was given an Individualized Education Program ("IEP") summary report by his school. Ex. 13F. The report stated that JP had a low score on a reading test and that the school would provide him 30 minutes a day of special education services to build his vocabulary. The school administered an IQ test, and JP's score was 67. The report stated the following about the accuracy of the score:

> [JP] obtained a Full Scale Intelligence Quotient (FSIQ) score of 67 (1st percentile), which ranks in the Extremely Low range. However, this score should not be interpreted as an accurate representation of his true abilities since his low Verbal Comprehension score significantly skewed his overall score, and this is an area that

---

[1] Plaintiff was already receiving her own disability benefits based on a learning disorder. Dkt. #11 at 2.

1

> has been documented to be an area of relative difficulty for [JP]. His FSIQ is comprised of his performance on the Verbal Comprehension Index (VCI), Perceptual Reasoning Index (PRI), Working Memory Index (WMI), and the Processing Speed Index (PSI) and their subtests. It appears as though he has a relative strength in solving visual problems and a relative weakness in providing verbal answers.

R. 482.

On May 20, 2011, the school produced an updated IEP report. R. 460-473. According to this report, JP had "exhibited some improved scores but was still slightly below average to borderline for receptive and expressive vocabulary." Dkt. #11 at 3. Around this time, plaintiff sought treatment for JP at the Janet Wattles Center. JP was diagnosed with ADHD and depressive disorder and assessed a GAF of 42. He was given ADHD medications but plaintiff was not able to take JP to subsequent appointments and stopped giving him the medication.[2]

In July 2011, JP was evaluated by Dr. John Peggau, a psychologist consultative examiner. JP's mother was also present and offered observations. JP was then nine years old. In his report, Dr. Peggau observed that JP was fidgety and "poorly oriented" but that he paid attention. *Id.* at 4. Dr. Peggau asked JP questions, such as arithmetic problems and the name of the current president, and JP gave wrong answers, stating for example that George Washington was the current president. Dr. Peggau noted that JP had little knowledge of current news events. Dr. Peggau also administered the Wechsler Intelligence Scale for Children-IV. JP's full-scale IQ score was 68. Dr. Peggau diagnosed plaintiff with a learning disability, NOS, and disruptive behavior disorder, NOS, and assessed his GAF as 62. R. 351.

On August 31, 2011, JP was seen by Dr. Richard Jaconette for a psychiatric evaluation. He noted that that JP had a subdued, constricted effect with minimal speech production, that JP was "distractible and inattentive" and "aggressive with his younger sister," that JP had

---

[2] In her briefs, plaintiff did not explain why she stopped these treatments and medications.

"developed anxiety and depressive symptoms [because he recognized] that he is not performing up to expectations," and that he was not taking his medications. Dkt. #11 at 4.

In December 2011, JP's special education teacher, Jennifer Bast, completed a Teacher Questionnaire rating JP's functioning. Ex. 4E. Her conclusions are summarized below. In 2011, two state agency psychologists (Hudspeth and Havens) reviewed JP's records and completed the Childhood Disability Evaluation Form. Exs. 7F &11F. They each found that JP had severe impairments of ADHD, learning disability, and depression but found that he did not meet or functionally equal a listing because he had "less than marked" limitations in the first three domains (*i.e.* acquiring and using information; attending and completing tasks; and interacting and relating with others) and no limitations in the last three domains (*i.e.* moving about and manipulating objects; caring for yourself; and health and physical well-being).

On February 8, 2013, a hearing was held before an administrative law judge. Plaintiff's representative argued that "this is a pretty clear listing case based on two different IQ scores, which are both below 70." R. 61. Ellen Rozenfeld, a psychologist, testified as the impartial medical expert. There was some discussion about whether JP's IQ scores were valid and whether he had been diagnosed as mentally retarded. Because Dr. Rozenfeld was not able to review all the documents, the ALJ decided to send Dr. Rozenfeld interrogatories after the hearing.

On February 19, 2013, Meghan Gavin, another special education teacher, also completed a Teacher Questionnaire about JP. Her conclusions are summarized below.

On August 25, 2013, Dr. Rozenfeld submitted interrogatory answers, which consisted of a narrative. Ex. 15F. She noted that school records showed that JP was "a cooperative boy who follows classroom procedures and rules well," that he "works independently at times and finishes most of his work though he tends to be easily distracted and needs reminders to stay focused,"

3

that he "gets along with peers," and that "[n]o concerns were noted in the area of independent functioning." R. 517. She noted that JP had a full-scale IQ score of 67, but also observed that the school stated that it did not believe this was an accurate representation of JP's abilities.

On September 11, 2013, a second hearing was held. Because Dr. Rozenfeld was not able to testify, the ALJ called a new medical expert, Dr. Joseph Cools. He reviewed both the relevant records, as well as Dr. Rozenfeld's narrative. Both the ALJ and plaintiff's representative questioned Dr. Cools at length about JP's IQ scores, his special education assistance, his psychological diagnoses, and whether he met listing 112.05(D). Dr. Cools discussed whether JP had deficits in "adaptive functioning" (one of the requirements of Listing 112.05).

On September 19, 2013, the ALJ issued his opinion, finding JP not disabled. The ALJ found that JP had the severe impairments of ADHD, learning disability and depression. The ALJ found that JP did not meet either Listing 112.05(D) ("Intellectual Disability") or Listing 112.11 ("Attention Deficit Hyperactivity Disorder"). The ALJ also found that JP did not equal any listing based on an analysis of the six domains applicable to child disability cases.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

4

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

To determine whether an individual under the age of 18 is disabled, an ALJ applies a three-step sequential evaluation. 20 C.F.R. § 416.924(a). The ALJ must inquire whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"; and (3) the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing, or that functionally equals the listing. To functionally equal a listing, the impairment must cause a "marked" limitation in two domains of functioning or an "extreme" limitation in one of the six domains. 20 C.F.R. § 416.926a(b)(1)(i-vi).

On appeal, plaintiff raises one argument. She argues that the ALJ failed to adequately address whether JP met Listing 112.05(D) based on his two IQ scores in the 60-to-70 range. Plaintiff does not challenge any other aspect of the decision, including the finding that JP did not meet the listing for ADHD or did not functionally equal a listing based on the six domains.

Listing 112.05 is entitled "Intellectual Disability." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05. It contains a general, introductory section, stating that the claimant must be characterized

"by significantly subaverage general intellectual functioning with deficits in adaptive functioning," a provision sometimes referred to as the "capsule" definition. *See, e.g. Davis v. Colvin*, 2014 WL 4954470, *10 (E.D. Wisc. Oct. 2, 2014). In addition, the claimant must satisfy one of six criteria. Here, plaintiff relies on subsection (D), which states: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."

The parties agree that this language can be broken down into three or four separate requirements, but that only two are at issue here. The first is the subsection (D) requirement that there be a valid IQ score between 60 to 70. There is no dispute that the two scores, one from the school and one from by Dr. Peggau, fell in the upper part of this 60-to-70 range. The only question is whether they were "valid." The other requirement, taken from the capsule definition, is whether JP had "deficits in adaptive functioning." In some respects, the two requirements address the same larger concern—namely, that an IQ score alone, especially in this moderate range, may not accurately reflect a child's abilities. *See Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007) ("a low IQ, but not an IQ below 60, is insufficient, even with the presence of some impairment, to establish disability per se on grounds of mental retardation. The reason is that persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job."). Plaintiff argues that the ALJ erred in analyzing both requirements. It is plaintiff's burden to show that she met "all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

The Court first considers the argument that the two IQ scores were not valid. Here is the ALJ's explanation: "Despite Full Scale IQ (FSIQ) in the 60s, [JP] is not diagnosed with mental retardation by the consultative provider (CE-6F), the school, or his treating source. At the time of

the consultative exam, scatter was evident and the school records are clear that the FSIQ is not considered an accurate assessment of abilities due to scatter/uneven abilities." R. 22. This explanation, which relies heavily on Dr. Rozenfeld's narrative, contains two arguments.

First, the ALJ found it significant that no doctor or expert diagnosed JP as mentally retarded. On its face, this argument seems persuasive, but one potential problem in evaluating it is that neither the ALJ nor the parties have explained how the general conclusion links back to the specific two requirements at issue. Listing 112.05 does not refer explicitly to mental retardation. The implicit assumption seems to be that the standards used to diagnose mental retardation are essentially the same as those in Listing 112.05. In its response brief, the Government cites to three out-of-circuit cases and argues generally that the absence of a mental retardation diagnosis is "probative" on whether a party meets listing 112.05. Dkt. #17 at 4-5. This argument is not directly responsive to the issue of whether the IQ tests were valid. In her reply brief, plaintiff concedes that the lack of a diagnosis might be "probative," but argues that it is not the "single most important factor." In short, this appears to be a semantic dispute about the degree of emphasis to be given to this one factor. The parties seem to agree, however, that it was proper for the ALJ to consider this factor as one part of a larger analysis.

Second, the ALJ referred several times to the concept of "scatter." Here again, neither the ALJ nor the parties have provided much explanation about what is likely a technical concept in IQ testing. In fact, the Government did not discuss this issue at all, other than to note that Dr. Rozenfeld and Dr. Cools found the tests to be invalid. As best the Court can tell, "scatter" refers to variations in the component scores making up the overall score and in particular to wide

variations in those scores. The parties did not cite to any illuminating cases or authorities to help the Court understand these concepts.[3]

There was some discussion of scatter in the first hearing. Plaintiff's representative referred to the argument that the school IQ score might not be a "true IQ score" because it was "skewed by such a low verbal comprehension score." R. 71. Dr. Rozenfeld noted one "complicating factor" was that JP was bilingual and was "exposed to" both Spanish and English. R. 72. In her later-filed narrative, Dr. Rozenfeld stated that "scatter is evident" in the IQ scores from the Peggau test, but she did not provide any explanation for this conclusion. At the second hearing, Dr. Cools did not give a direct answer to the specific question of whether the tests were valid, although he did find (as discussed below) that the IQ scores were not an accurate assessment of JP's "adaptive functioning." Dr. Cools stated that he did not believe any IQ test, especially one given to "a nine-year-old kid," could establish mental retardation because "a lot of extra test variables" affect the score. R. 48.

As for the validity requirement, plaintiff argues that the bilingual concern raised by Dr. Rozenfeld was never mentioned by the ALJ; that, although the ALJ noted that the school questioned the validity of its IQ test, the ALJ never addressed the fact that Dr. Peggau himself

---

[3] The Seventh Circuit fairly recently discussed these issues and provided the following, somewhat inconclusive, observations:
> But the administrative law judge concluded that her IQ score of 68 was invalid. He based this conclusion mainly on Dr. Fink's report, which while stating that the plaintiff "appeared to make a sincere effort to perform the test tasks to the best of her ability," opined that because the results of the IQ test included "considerable interest scatter" this indicated "that there is higher potential and that an estimate of borderline intellectual functioning is the most appropriate conclusion." "Intratest **s**catter" just means that the variance in her scores on different questions in the IQ test was high. Dr. Fink did not explain why this signified a "higher potential" for intellectual activity. Nor did he opine on how much higher her intellectual potential is, but the implication is that he thought her true IQ at least 70, as that is the bottom of the "borderline intellectual functioning" range, "Borderline Intellectual Functioning," *Wikipedia,* http://en.wikipedia.org/wiki/Borderline_intellectual_ functioning, and he thought she was in that range. We'll assume he was correct.

*Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014).

did not explicitly raise questions about the validity of his test; and that Listing 112.05(D) refers specifically to a "verbal" or other score, which seems to reflect the idea that a verbal score alone, even if lower than the other component scores, could be used to satisfy subsection (D).[4] Neither the Government nor the ALJ has provided a clear response to these assertions.

Based on these arguments, the issue is a close call. However, the Court finds that, even though the ALJ has cited to several possible rationales supporting the conclusion that these test scores were not valid, the ALJ failed to adequately address all the issues and arguments. But this conclusion does not require a remand unless plaintiff can also show that the ALJ's analysis of the second requirement was flawed. *See, e.g., Griffin v. Colvin*, 2016 WL910506, *5 (N.D. Ill. Mar. 10, 2016) (although the claimant had a valid 59 IQ, claimant still did not meet listing 112.05 because he did not have deficits in adaptive functioning). As explained below, the Court finds that plaintiff has not met this burden.

As with the first requirement, there appears to be little case law or other guidance. Neither the ALJ nor the parties cited to any relevant cases. In *Novy*, the Seventh Circuit provided modest guidance. Relying on the DSM IV, the Seventh Circuit stated that this phrase "denotes the inability to cope with the challenges of ordinary everyday life." 497 F.3d at 710.[5] Dr. Cools testified that for a child, adaptive functioning focuses on whether a child can get along in school.

With this guidance, the Court considers the ALJ's explanation for finding that JP did not have deficits in adaptive functioning and therefore did not meet Listing 112.05(D) even though he had two IQ scores under 70. Here is the main summary from the opinion:

---

[4] Although not raised by plaintiff, the Court notes that the introductory portion of Listing 112 states: "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with listing 112.05."
[5] In *Cayton v. Colvin*, 2015 WL 1279741, * 6 (N.D. Ind. Mar. 19, 2015), the Court quoted the definition from *Novy* and then observed: "No specific measurement method is required [to determine deficits in adaptive functioning], nor has any circuit adopted a specific measurement standard."

> Furthermore, per school records, there are no concerns with adaptive functioning. The claimant's behavior at school and at home is somewhat discrepant with greater disciplinary problems noted in the home setting. He appears to respond to the structure in the school setting, has friends, and follows rules. There is no behavior intervention plan in place and there have been no suspensions. Per recent teacher questionnaire, no more than obvious problems are noted. He is prescribed medication with favorable response. The claimant's impairments are severe, but do not meet/medically equal, or functionally equal the listings. With regard to the domains, a less than marked limitation is supported in domains 1, 2, 3 and 5, with no limitation in domain 4. Given reference to possible side effects from medication in the absence of any severe physical issues, at most a slight limitation may be implicated.

R. 22. The ALJ also noted that both Dr. Rozenfeld and Dr. Cools provided "extensive testimony" and were "in concordance" that, although JP had some issues with distractibility, he was able to function in ways that did not "match the picture of mental retardation." R. 22.

This Court finds that this analysis rests on substantial evidence and does not reflect any errors of logic or law. Most notably, the ALJ placed great weight on the school records, specifically the two teacher questionnaires. They provide strong evidence. JP's teachers were able to observe him over an extended period. Ms. Bast saw JP for 60 minutes every day, and had known him for six months at the time she prepared the report. She answered 59 questions in total, and never assessed JP with a 5 rating (the highest rating, denoting "a very serious problem") on any question, and only once checked the box for a 4 rating (denotes "a serious problem"). The rest of her ratings are either a 3 ("obvious problem"), 2 ("slight problem"), or a 1 ("no problem"). In the third domain, "Interacting and Relating with Others," she rated JP as having no problems on every question in that category. R. 230.

Ms. Gavin, another special education teacher, had known JP for three years and spent 30 minutes with him each school day. The highest rating she gave JP was a 3 out of a 5, and many of her ratings were only a 1 or 2, indicating no significant problems. Her ratings are in line with those of Ms. Bast. This evidence is strong because these teachers saw JP every day and had a

10

longitudinal picture of his condition. Certainly, they spent considerably more time with JP than Dr. Peggau who saw JP for 65 minutes or Dr. Jaconette who saw him apparently only once. R. 352. As Dr. Cools testified, teacher reports are considered the "gold standard" for evaluating a child's adaptive functioning because school is comparable to work. R. 49.

In her two briefs, plaintiff almost entirely ignores these questionnaires, providing no real rebuttal. The only criticisms plaintiff directed at the questionnaires was to note that Ms. Gavin saw JP "for *just* 30 minutes daily" and that she failed to specify on the questionnaire exactly how many minutes of special education instruction JP was receiving for written language, although she did state that he was receiving 30 minutes for reading and 30 minutes for math. Dkt. #11 at 11 (emphasis added). As for the latter point, a commonsensical reading would suggest that this was an inadvertent omission, one that is not especially relevant in any event. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading."). As for the former point, the Court does not find that it even supports plaintiff. It is true that Ms. Gavin saw JP for only 30 minutes a day, but she saw him every school day for three years. This would add up to a large amount of time—far more than any of the doctors spent with JP.

The ALJ relied not just on the school records themselves, but also on the two impartial psychological experts who reviewed these records and who concluded, in their professional opinions, that JP did not have deficits in adaptive functioning. For example, Dr. Rozenfeld stated in her narrative that JP was "a cooperative boy who follows classroom procedures and rules well." R. 517. Plaintiff has not questioned the expertise or judgment of these experts, nor pointed to any specific flaw in their reasoning. Significantly, no doctor opined that JP met the

listing or had deficits in adaptive functioning. Thus, for the ALJ to reach a contrary result, he would have had to essentially play doctor and overturn the ruling of two experts.

Rather than addressing this evidence, plaintiff in her briefs focused mostly on Dr. Peggau's report and on a few miscellaneous observations about JP's behavior. Specifically, in her opening brief, plaintiff cites to snippets of evidence indicating that JP was aggressive. Dkt. #11 at 10 (citing R. 260, 268, 339, 397). These observations largely consist of statements plaintiff herself made or reported to doctors. The only instance in which a doctor directly observed any allegedly "aggressive" behavior was on the one visit to Dr. Jaconette who wrote in his notes: "aggressive with younger sister." R. 339.

This evidence, while modestly supporting plaintiff's case, is not a basis for a remand. First, the general line of evidence was acknowledged by the ALJ and by the experts. *See* R. 18 (summarizing testimony of mother); R. 21 (ALJ noted: "Per parent report, he does not turn in his work, has threatened to run away, pretends not to understand English, has a hard time with focusing and concentrating, and *struggles with aggression at home*.") (emphasis added); R. 518 (Dr. Rozenfeld: "[JP] follows rules at school but not at home."). On a broader level, the ALJ and the two experts offered their opinion that a discrepancy existed between JP's behavior at home and at school and that his negative behavior was mostly confined to the home setting and interactions with his sisters and mother.[6] R. 22. This Court cannot conclude that there is any flaw in this effort to resolve seemingly discordant evidence.

---

[6] Although not mentioned by the ALJ, the Court notes by way of background that Dr. Peggau indicated that JP expressed concerns about his life at home and his relationship to his mother. Here is what Dr. Peggau wrote on this point: "The claimant's parents are not together. His mother has six children and the claimant and one sister are from the same biological father. They have visitation with their father on weekends and the claimant said that he prefers to be at his father's home. His mother seems to pick on him, according to claimant's perception. He is the only male in the household and lives with her and four sisters." R. 351.

12

In addition to these observations, plaintiff relies on the Peggau report. But this report is not enough to undermine the substantial evidence supporting the ALJ's decision. First, the ALJ did not ignore this report, and summarized it at length. *See* R. 17. It is true, as noted above, that the ALJ did not specifically consider the fact that Dr. Peggau never explicitly questioned the validity of the IQ report he administered. But this does not mean that the ALJ ignored this report altogether. Second, the report is equivocal on the relevant issues here. Although Dr. Peggau noted that JP had trouble answering questions, such as who was the current president, Dr. Peggau did not go on to diagnose JP with mental retardation. He also made several observations undermining plaintiff's theory. As the ALJ summarized, although Dr. Peggau noted that JP was fidgety and squirmed around, he also noted that JP "paid attention" and was "very compliant" during the interview. R. 347-48. It is not even clear whether Dr. Peggau was aware of the school records. R. 347 (stating that he had "no objective records" to review). Dr. Peggau never directly addressed any of the points relied on by Dr. Rozenfeld or Dr. Cools. Finally, to the extent Dr. Peggau's report could be read as contrary to the opinions of the two experts, as well as to those of the two state agency physicians, plaintiff has not articulated a reason why the ALJ should have chosen that one opinion over all the others. At some point, the ALJ has to make a judgment about the evidence. The Court has not found anything suggesting that the ALJ engaged in a flawed process that would require this Court now to second-guess his conclusion.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the ALJ's decision is affirmed.

Date: July 13, 2016       By: _____
                              Iain D. Johnston
                              United States Magistrate Judge

13